**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00089-CV**
_____

**IN THE ESTATE OF PAULA HALLY TILLMAN FLARITY**

On Appeal from the County Court at Law No. 2
Montgomery County, Texas
Trial Cause No. 17-34878-P

**MEMORANDUM OPINION**

In this dispute over the probate of a will, the issues are whether the probate court deprived the appellant of his right to obtain discovery before the trial, whether the testator, Paula Hally Tillman Flarity, had testamentary capacity when, in 2004, she executed her last will, and whether the probate court abused its discretion by appointing the executors Paula named in her will to that office. After considering the record and the parties' briefs, we overrule the appellant's ten issues and affirm the probate court's order.

1

Background

Paula Flarity died on November 16, 2016. At that time, she was eighty-six years old and resided in Montgomery County, Texas. Four children survived her death—sons Joe and Wes Flarity, and daughters Laurie Anne Flarity-White and Merrie Flarity. Joe and Laurie appeared in response to the application that Wes and Merrie filed to probate Paula's last will. The application Wes and Merrie filed asked the probate court to sign an order admitting a will Paula signed in 2004 to probate.[1]

The will offered for probate includes a self-proving affidavit, a device recognized by the Estates Code that allows probate courts to admit self-proved wills to probate without requiring those who witnessed the will to testify about the facts that are in the witnesses' self-proving affidavits.[2] In her will, Paula asked the court to appoint Merrie and Wes as co-executors for Paula's estate.

In response to the application, Joe filed a general denial. Joe's answer alleges the court should require the Applicants to "prove their claims[.]" The answer contains no other allegations showing that Joe intended to contest the application based on the claims he asserted later in his amended answer, which he filed shortly before the trial. For example, in his amended answer, Joe alleged the notary who signed Paula's will failed to properly administer a proper oath to the witnesses

---

[1] Laurie Ann Flarity-White did not file a brief in Joe's appeal. For that reason, we assume she was satisfied with the trial court's order probating Paula's will.

[2] Tex. Est. Code Ann. § 251.102.

because she failed to give them an oral oath. Joe also alleged that when Paula signed the will at issue, she no long had testamentary capacity to sign a valid will.

When Joe served the Applicants with discovery, his pleadings consisted of his original answer, which was a general denial. In the requests for production Joe served on each Applicant, Joe asked the Applicants to produce sixty-three categories of documents, which covered a period dating back more than twenty years. Joe also served each Applicant with interrogatories. In them, he asked the Applicants to answer questions that cover periods dating back nearly ten years.

The Applicants objected to Joe's requests for discovery. Their objections assert that the discovery required them to produce information that was either not relevant to the suit or not reasonably calculated to lead to the discovery of admissible evidence. Joe moved to compel, and the probate court considered the objections by submission. Following that hearing, the probate court denied Joe's motion. After that, Joe filed a motion for rehearing. This time, the probate court conducted a hearing in which the attorneys for the parties appeared and argued whether Joe was entitled to have the Applicants respond to his discovery. The Applicants pointed out that they were seeking to probate a self-proved. Joe's attorney argued that based on his general denial, he had the right to responses to the discovery he had served. When the probate court asked why such broad discovery was required in a case involving a self-proved will, Joe provided the probate court with no explanation except his

3

claim that his general denial entitled him to responses to the discovery that he had served. Based on the issues that were framed by the pleadings before the probate court at that time, the probate court told Joe the court viewed his discovery as overly broad. Specifically, the court said Joe's discovery asked for "[y]ears and years and years [of information and] tons and tons of documents" in a case involving a request to probate a self-proved will. Given Joe's failure to offer any further explanation, the probate court sustained the Applicants' objections and denied Joe's motion to reconsider its ruling.

Just over two months before the trial, Joe amended his answer. For the first time, he alleged that Paula lacked testamentary capacity when, in 2004, she signed the will. He also alleged the Applicants had exercised undue influence over Paula's decision to change her will. And he claimed that Wes and Merrie were not suitable executors. After Joe amended his answer, however, he never served the Applicants with any more discovery. And he never served them in the case at any point with a request for disclosure. Finally, Joe never asked the probate court to reconsider its earlier discovery rulings after considering what the proper scope of discovery should be in a case that involved claims contesting the validity of Paula's self-proved will.

In early 2018, the probate court called the case to trial. Seven witnesses testified over the course of a two-day trial to the bench. Wes and Merrie called three of the witnesses when presenting their case in chief—Merrie, Wes, and Nancy Karp,

4

one of the witnesses who attested to Paula's last will. When Merrie and Wes testified, Joe objected, arguing the Applicants never supplemented their objections to the discovery he had served on them or provided him with the names of the witnesses they intended to call in the trial. During Merrie's testimony, Joe also objected when her attorney asked Merrie to identify Paula's last will. The probate court overruled Joe's objections, allowed the Applicants' witnesses to testify, and admitted Paula's will. In written findings filed after the trial, the probate court explained that the Applicants did not have a duty to supplement their responses to Joe's discovery because their objections to his discovery had been sustained.

We will summarize the testimony from the trial, but we summarize it in the light that favors the probate court's written findings because the written findings "have the same force and dignity as a jury's verdict upon questions."[3] During Merrie's testimony, she explained that, in 2003, Paula moved to the same town where Merrie lived. When Paula died in 2016, Paula lived in a house located close to Merrie's. According to Merrie, Wes lived in another town and Joe and Laurie lived in other states. Consequently, Merrie spent more time with Paula over the last decade of Paula's life than did Merrie's siblings. According to Merrie, she usually went to Paula's home about once a week to see her, a practice that she had followed

---

[3] *Anderson v. Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).

for many years. While there, Merrie paid Paula's bills, using checks drawn on Paula's checking account under the authority Paula gave her in 2003 to sign checks.

Around 2006, Paula gave Merrie medical and durable powers of attorney to act on Paula's behalf. While Merrie was given these powers, she explained that Paula was still able and continued to make her own decisions about how to spend and invest her money. Specifically, Merrie testified that Paula always exercised "control over what I was doing[.]" And when Merrie paid Paula's bills, Paula told Merrie which bills she wanted paid.

During her testimony, Merrie addressed Joe's claims asserting Paula's will was not valid. She denied that she ever asked Paula to leave her part of her estate. Merrie described Paula's capabilities in 2004, explaining that Paula enjoyed diverse activities like reading and painting. According to Merrie, in 2004, Paula was still driving her car and handling her medical decisions on her own.

Merrie acknowledged she had long been aware that Paula did not plan to split her estate equally between her four children. Merrie also testified that, in 2004, she knew that Paula wanted to make a new will. Merrie knew that Paula hired her son-in-law, who is also Merrie's brother-in-law, to draft the will before the court. Merrie further agreed that she knew that in that will, Paula was planning to leave her children different shares in her estate. According to Merrie, Paula was unhappy with how much time Joe and Laurie had spent with her over the years as she aged. Merrie

6

stated that Paula's relationship with Joe had been strained for a long time. For instance, in a will Paula signed in 2000, which was her last will until she signed the one before the court, Paula left Joe a one percent share in her estate. According to Merrie, after Paula reduced Joe's share to one percent in the will she signed in 2000, Paula told her she was leaving "Joe [one] percent because she felt that he didn't care about her anymore. He didn't love her. He didn't care if he ever came to Texas again, and she was extremely hurt by this."

When Wes testified, he also addressed Paula's capabilities in 2004. According to Wes, Paula could drive and was driving her car in 2004. Wes stated that Paula enjoyed activities like ballroom dancing and various art projects that she was involved in during 2004. Wes explained he saw Paula weekly when they ate lunch together. Wes testified that, in his opinion, Paula was capable of making decisions without assistance at all times in 2004.

Nancy Karp, the last witness the Applicants called in the trial, testified by deposition. Karp was one of the witnesses who signed Paula's last will. In her testimony, Karp explained that, in 2004, she was working for a newspaper that had offices in Montgomery County. While there, an elderly woman came into the offices asking whether there were people there who could witness her will. According to Karp, Paula did not appear to be under the influence of drugs that day, no one tried

to influence Paula to sign the will while she was in the newspaper's offices, and Paula thanked her for serving as one of the witnesses after signing the will.

Joe called five witnesses in presenting his case: (1) Tina Dickerson (the notary who notarized a will Paula signed in 2000); (2) Nancy Karp (one of the witnesses to the will Paula signed in 2004); (3) Nancy Nygaard (the notary who notarized Paula's last will); (4) Becky Flarity (Joe's wife); and (5) Joe. When Tina testified, she stated that she notarized a will that Paula signed in 2000. Tina acknowledged she had little recall about the will-signing ceremony involving the will Paula signed in 2000. Tina explained that in that ceremony, she would not have given the witnesses oral oaths because that was not the procedure that she followed.

Joe recalled Karp to present more of her deposition testimony into evidence in the trial. When she was recalled, Karp testified that in 2004 when Paula came into the newspaper offices, (1) she said she wanted to change her will because she was angry with one of her children; (2) Paula appeared to be lucid; (3) no one, while in the offices, coerced Paula into signing the will; and (4) in Karp's opinion, Paula knew she was executing a will.

Joe also called Nancy Nygaard, the notary who notarized the will Paula signed in 2004. Nygaard testified it was not unusual for people to come into the newspaper's offices and ask whether someone in the office could notarize a will. Nygaard testified that she could not now specifically recall the will-signing ceremony where Paula

8

signed her will, but when she notarized a document, she administered an oath. Nygaard agreed she did not give Paula or the witnesses to the will oral oaths before they signed the will. That said, Nygaard also testified she knew the witnesses because they also worked in the newspaper's offices and that while she could not specifically remember this ceremony, the witnesses would typically sign the document after looking it over.[4] Nygaard explained that she knew the witnesses had signed the will.

During Joe's testimony, Joe described Paula as a woman who, for many years, had suffered from depression. According to Joe, Paula began having symptoms of depression when she was a young mother. Joe offered, and the court admitted, an email from Paula to Joe in 1997. The email reflects that Paula believed she was having symptoms of severe clinical depression. Paula states in the 1997 email that she did not feel she could control "how I think." The email ends with Paula's statement that "it doesn't appear to me that you are looking forward to my coming [to see you]. . . If you don't care much one way or the other, I won't come." Joe also testified that, in 1997, he began to notice that Paula could no longer order for herself when dining out in restaurants.

---

[4] The witnesses to Paula's will as well as Paula signed their names below a paragraph stating they were first duly sworn.

In another email that Paula sent Joe in March 2000, Paula told Joe she was having problems with her medicine and that Laurie and Merrie had persuaded her to buy a lot close to Merrie's. Paula stated she did not want to buy the lot, but she was still planning to build a home on the lot. In the same email, Paula told Joe that she could "read the handwriting on the wall[, she felt] rejected, hurt and abandoned." Joe contends that Paula's emails, and others we have not specifically described, show the record contains evidence that conflicts with the probate court's findings.

Joe testified that around 2012, Paula called him on the phone and complained that Merrie was verbally abusive to her and was being mean. She also told him she thought that Merrie might try to have her committed to an institution. On cross-examination, Merrie's and Wes's attorney asked Joe why Paula told him she was unhappy with him. Joe explained Paula often made statements like that to make him feel sorry for her. Joe described Paula's behavior as manipulative. By 1997, Joe said, he thought Paula badly needed professional help to help her with depression. But Joe agreed that he neither asked anyone to institute a guardianship proceeding to get Paula the help she needed, nor did he ever take her to a doctor.

Becky (Joe's wife) testified about statements she heard Wes make in the courtroom during a recess. According to Becky, she overheard Wes tell his attorney that he did not recall knowing that Paula had named him as a co-executor of the estate. According to Becky, Wes had been in a motorcycle accident several years

10

before, and since that accident, he had suffered from "a lot of memory issues[.]" Becky also addressed Paula's health, explaining that she noticed that Paula began having problems deciding routine matters around 1999. According to Becky, Paula's condition got worse each succeeding year. Becky also testified that Paula told her that she felt Merrie had pressured her into moving from her home in Harris County to Montgomery County and that Paula told her she "felt powerless to resist."

Following the trial, the probate court issued detailed written findings of fact and conclusions of law. These findings fully explain the probate court's findings, which rejected Joe's claims alleging Paula lacked testamentary capacity and his claim that Merrie and Wes had unduly exercised their influence to get her to change her will. We mention several of the probate court's findings that are particularly relevant to issues Joe raises in his brief. The court's findings including findings that

- the notary who signed the will Paula executed in 2004 did not administer oral oaths, but gave the witnesses a written oath during the will-signing ceremony;
- the witnesses saw Paula sign the will, acknowledged the will by signing as a witness, and each signed their names to the will while in the presence of the notary;
- Paula "possessed testamentary capacity in 2004" when she executed the will; and
- Wes and Merrie are suitable executors for Paula's estate and are not disqualified from that office.

Joe raises ten issues in his brief. To shorten the opinion, we take the issues out of order, and we address Joe's fifth and sixth issues before discussing his other issues.

11

Analysis

*Discovery*

In issues five and six, Joe argues the probate court erred by allowing the Applicants to call witnesses and offer documents in the trial when the Applicants never answered or responded to his discovery by providing him with responsive documents or with answers. Joe suggests the Applicants ignored their continuing duty to supplement the discovery he served on them given the claims he raised in his amended answer.

Joe is simply mistaken that the Applicants had a duty to supplement their responses to his discovery given the fact the probate court sustained their objections to the discovery. Rule 193.4(b) of the Texas Rules of Civil Procedure provides "[t]o the extent the court sustains the objection or claim of privilege, the responding party has no further duty to respond to that request."[5] The record shows the probate court sustained the Applicants' objections to all of Joe's discovery. Thus, the Applicants had no duty to supplement their responses or their answers under the record that is relevant to the appeal.[6]

Joe also argues the probate court erred by sustaining the Applicants' objections to his discovery and by denying his motion to reconsider. This is so, Joe

---

[5] Tex. R. Civ. P. 193.4(b).
[6] *Id.*

12

suggests, because his general denial placed the parties and the court on notice that he intended to contest Paula's will on all grounds. The probate court, of course, disagreed, as it rejected that argument following a hearing. Paula's will is on its face in a self-proved form, and it was before the probate court when the court, in the discovery hearing, decided the proper scope of discovery needed to resolve the disputed issues, which was a decision it made based on the pleadings before the court at that time.

In a probate proceeding, the application to probate the will is merely a preliminary proceeding, as an order admitting a will to probate does not prevent a party from later contesting the validity of the will. In other words, the issues before a probate court in the applications stage are generally limited to only a few facts. For instance, when offering a self-proved will for probate, the Estates Code requires that the applicant establish just six facts: (1) the testator is dead, (2) the testator died less than four years ago and the Applicants filed the application within four years of the testator's death, (3) the probate court has jurisdiction and venue over the estate, (4) citation has been served and returned in the manner and for the period required by the Estates Code, (5) the proposed administrators of the estate have a right to letters of administrations and are not disqualified, and (6) the testator never revoked the will.[7]

---

[7] Tex. Est. Code Ann. §§ 256.251, .252.

Here, Joe's answer—a general denial—gave the probate court no reason to believe that broad discovery more typical in proceedings where there are claims contesting the will was required or necessary given the six facts the Applicants needed to prove. Thus, we agree with the probate court's view that the discovery Joe sought was far too broad based on the pleadings and the arguments he presented to support his claim that he was entitled to have the court grant his motion to compel.[8]

Courts have a duty to control the scope of discovery in a case so the dispute may be resolved without imposing unnecessary costs and expense on the parties or the courts.[9] The discovery Joe served on the Applicants asked them for information remote in time from the year Paula signed her last will, as well as for information that was not tailored to the issues that were, at that point, in dispute. For example, Joe's interrogatories asked the Applicants to describe (1) their respective relationships with Paula from 1993 until she died, (2) how often she contacted them in-person, by phone, email, text messages, and by letter during those years, (3) the names of all witnesses who knew about any part of Paula's relationship with the Applicants from 1993 forward, and (4) to describe each photo, letter, car, email, phone bill, tape record "then or at any time." While the will offered for probate is dated in 2004, Joe's requests asked the Applicants to produce documents from April

---

[8] *Id.* § 251.102(a).
[9] *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1988) (recognizing that courts "must make an effort to impose reasonable discovery limits").

14

1, 2007 to the date of production. Thus, while some interrogatories and requests might have discovered information relevant to a will contest case, the question is whether they were reasonably tailored to seek documents addressing the six facts the Applicants needed to prove to probate a self-proved will. The probate court did not abuse its discretion by finding the discovery overly broad and as not reasonably calculated to lead to the discovery of evidence tied to the six facts at issue in the dispute as the pleadings before the court framed the dispute when it ruled.

Joe's interrogatories, for instance, are far too broad and do not comply with the rules of discovery applicable to the case. For instance, Joe's interrogatories required that each Applicant provide Joe with more than the twenty-five answers in violation of Rule 190.3(3).[10] Under Rule 190.3 of the Rules of Civil Procedure, the probate court had the right to count "[e]ach discrete subpart of an interrogatory" as a separate question when it calculated whether Joe's interrogatories complied with Rule 190.3.[11] Many of the interrogatories did not ask for information relevant to the six facts at issue given the pleadings before the court when it ruled. We conclude the probate court did not abuse its discretion by sustaining the Applicants' objections to Joe's interrogatories.

---

[10] Tex. R. Civ. P. 190.3 (providing Rule 190.3 governs discovery in civil cases absent exceptions that do not apply here); 190.3(3) (providing that a party governed by Rule 190.3 may require answers to no more than twenty-five questions, excluding those asking only to identify or authenticate specific documents).

[11] *Id.*

15

Joe's requests for production are also far too broad. Rule 190.3 allows parties to file requests that seek information relevant to the "subject matter of the pending action" as it relates to a party's claim or defense.[12] We share the probate court's view that Joe's requests, generally speaking, failed to request documents calculated to be relevant to the six facts the Applicants were required to prove under Chapter 256 before the probate court could admit the will to probate.[13] They seek documents far too remote from 2004, which is the year relevant to the probate court's discovery rulings. We conclude the probate court did not abuse its discretion by concluding that Joe's requests were not narrowly tailored to the issues that were framed by the pleadings before the court when it sustained the Applicants' objections.[14]

The duty to propound proper discovery requests is on the litigants, not the courts.[15] So the probate court did not have a duty to wade through Joe's discovery and isolate those requests and interrogatories that did comply with the rules from the rest, particularly when Joe failed to point out that he wanted the court to compel the

---

[12] *Id.* at 192.3(a).

[13] Tex. Estates Code Ann. §§ 256.251, .252.

[14] *See In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding) ("Discovery orders requiring document production form an unreasonably long period or from distant and unrelated locales are impermissibly overbroad."); *Texaco Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995) (concluding that the discovery requests were overly broad because they were "not merely an impermissible fishing expedition" but "an effort to dredge the lake in hopes of finding a fish").

[15] *In re TIG Ins. Co.*, 172 S.W.3d 160, 168 (Tex. App.—Beaumont 2005, orig. proceeding).

Applicants to answer a specific interrogatory question or a specific enumerated request.[16] And while Joe amended his pleadings a few months before trial, expanding the facts at issue in the dispute to include claims contesting the will, he never served the Applicants with more discovery after amending his pleadings.[17]

We conclude the probate court did not abuse its discretion by finding Joe's discovery overly broad given the issues framed by the pleadings before the court when it ruled. Accordingly, Joe's fifth and sixth issues are overruled.

*Admission of Evidence in the Trial*

In issues, four, seven and eight, Joe complains the probate court erred when it (1) allowed the Applicants to introduce testimony and documents in the trial that were not relevant to the facts they needed to prove to have the probate court sign an order authorizing the Applicants to probate Paula's will, (2) permitted the Applicants to ambush him with their evidence, and (3) ruled the Applicants' evidence was admissible after it failed to require the Applicants to answer his discovery. Before addressing these issues, we note the standard of review that

---

[16] *Cf. In re CSX Corp.*, 124 S.W.3d at 153; Tex. R. App. P. 33.1.

[17] *See In re State Farm Lloyds*, 520 S.W.3d 595, 599 (Tex. 2017) (orig. proceeding) ("[r]easonableness and its bedfellow proportionality, require a case-by-case balancing of jurisprudential considerations, which is informed by factors the discovery rules identify as limiting the scope of discovery and geared toward the ultimate objective of obtaining a just, fair, equitable and impartial adjudication for the litigants with as great expedition and dispatch at the least expense . . . as may be practicable.") (cleaned up); Tex. R. Civ. P. 63 (amendments and responsive pleadings).

17

applies to them. On appeal, a court's rulings admitting or excluding evidence are matters that are committed to the trial court's sound discretion.[18] Trial courts abuse their discretion when they act "without regard for the guiding rules or principles."[19] And even if the trial court abused its discretion by admitting or excluding evidence, the judgment will be reversed only if the record shows the error was harmful — that is, an error that probably caused the trial court to render an improper judgment.[20]

The arguments Joe presents to support these three issues rely on a false premise, Joe's mistaken belief that the Applicants had a continuing duty to supplement their objections to his discovery after he amended his pleadings. We have already explained why no such duty exists when the record shows the lower court sustained the objections relevant to the discovery at issue in the appeal.[21]

Joe also complains the trial court gave him almost nothing in discovery and then allowed the Applicants to conduct a trial by ambush. But Joe has only himself to blame if he was less than fully prepared for the trial. He is the party that failed to propound proper discovery in the first instance, to ask the probate court to allow him to serve more discovery after amending his pleadings, and to serve the Applicants with a request for disclosure, which would have allowed him to obtain the basic

---

[18] *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012).
[19] *Id.*
[20] *Id.*; Tex. R. App. P. 44.1(a)(1).
[21] Tex. R. Civ. P. 193.4(b).

information about the Applicants' claims.[22] We conclude Joe failed to protect his rights and cannot now be heard to shift that blame to others.

Joe also argues that the trial court should not have allowed the Applicants to call Nancy Karp to testify (by deposition) about what she observed during the will-signing ceremony in 2004 based on their application to probate a self-proved will. But the issues framed by Joe's pleadings broadened the disputed issues to include evidence relevant to the 2004 will-signing ceremony. For that reason, Karp's testimony was relevant to the issues the parties tried. Even more, the fact the Estates Code authorizes probate courts to admit self-proved wills without requiring the testimony of the attesting witnesses does not bar a party from calling the attesting witnesses should they want to provide the probate court with more evidence than the court might need to grant the application. The fact the Estates Code dispenses with the requirement to call the attesting witnesses does not mean they cannot testify if called.[23]

We conclude Joe's fourth, seventh, and eighth issues are without merit. As a result, the issues are overruled.

---

[22] *Id.* 194.2(e).

[23] Tex. Est. Code Ann. § 251.102 (providing that a court "may" admit a self-proved will "to probate without the testimony of any subscribing witnesses"); *In re Estate of Standefer*, 530 S.W.3d 160, 166 (Tex. App.—Eastland 2015, no pet.) ("Once a proponent admits a self-proved will into evidence . . . he has prima facie established that the will was properly executed.").

*Sufficiency of the Evidence*

In issues one through three, Joe suggests the evidence is legally and factually insufficient to support either the trial court's ruling admitting Paula's 2004 will to probate or to appoint Merrie and Wes to be the co-executors of Paula's estate. In a legal sufficiency review, we will find the evidence legally sufficient to support the lower court's ruling unless the record shows "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact."[24] On appeal, we view the evidence before the court in the light that favors the findings the appellant challenges in the appeal, and we indulge every reasonable inference in support of the ruling the lower court made that supports affirming the judgment.[25]

In contrast, when conducting a factual sufficiency review, we decide whether the evidence admitted in the trial supports the ruling the appellant has challenged in the appeal.[26] When the party that appeals did not have the burden of proof on the issue the parties tried, we will not set aside the verdict unless the overwhelming great

---

[24] *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (cleaned up).

[25] *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

[26] *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998).

weight and preponderance of the evidence reveals that the verdict was clearly wrong and unjust.[27] In contrast, when the court, as the factfinder, could reasonably have made the finding or findings the appellant has challenged, the appellate court will find the evidence is sufficient to support its judgment.[28]

The parties elected to try the case to the bench. Thus, they gave the probate court the right to weigh the evidence and to assess the credibility of the witnesses who testified in the trial.[29] As the factfinder, the probate court could decide which witnesses, in its discretion, to believe.[30] The question on appeal is whether that evidence shows the trial court's verdict was reasonable.[31] When the judge is given the role of the factfinder, she may not "believe testimony that is conclusively negated by undisputed facts."[32] But even in cases involving undisputed facts, factfinders may often draw different inferences from the same evidence and those inferences can still be reasonable.[33]

In issue one, Joe argues the evidence does not support the probate court's ruling admitting the will to probate. In issue two, Joe argues the evidence is insufficient to show Paula executed a self-proved will. In issue three, Joe argues the

---

[27] *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).
[28] *City of Keller*, 168 S.W.3d at 827.
[29] *Id.*
[30] *Id.*
[31] *Id.* at 820.
[32] *Id.*
[33] *Id.* at 821.

evidence is insufficient to show that Paula had testamentary capacity in 2004 when she executed her last will. Joe's first two issues hinge on his argument that the Applicants failed to establish that Nancy Nygaard, the notary to the will, gave the witnesses an oral oath before they signed the will.

While Joe argues the Estates Code requires that notaries to give witnesses to a will an oral oath, Joe has not argued that Nygaard gave the witnesses no oath. Instead, the record shows Nygaard gave the witnesses a written oath. The will admitted into evidence contains a joint affidavit, signed by three attesting witnesses. The will also contains Paula's signature. The joint affidavit recites the witnesses to the will were duly sworn. The affidavit also reflects, among other things, that the witnesses signed the will at Paula's request and in her presence. In form and in content, the affidavit tracks the language that is required by the Estates Code's provisions for self-proved wills.[34] Nygaard's jurat also recites that the witnesses subscribed their names to the will in her presence and that the witnesses were sworn.

While the witnesses were not given *oral* oaths, the Estates Code merely requires an oath in some form to make a will that complies with the Code. The term *oath* is not defined in the Estates Code, so the provisions of the Code leave open the possibility that the required oath can be either oral or written.[35] When the Estates

---

[34] Tex. Est. Code Ann. § 251.104(e) (Supp.).
[35] *See id*. §§ 22.001-.034 (Definitions)

22

Code does not define a term in that Code, the Code Construction Act applies to the words.[36] Under the Code Construction Act, *oath* "includes the oath in an affidavit."[37] The oaths relevant to Paula's last will are found in the joint affidavit the attesting witnesses signed. Because the joint affidavit as well as the jurat reflects the attesting witnesses were given oaths, we overrule Joe's first and second issues that argue Nygaard, as a notary, failed to administer oaths to the attesting witnesses to the will in a required form.[38]

In issue three, Joe argues the Applicants failed to present evidence sufficient to establish that Paula "possessed testamentary capacity" when she executed her last will. The probate court's written findings include a finding that Paula "possessed testamentary capacity when she executed the 2004 Will." Joe did not have the burden of proof on this issue. Thus, to overturn the verdict, Joe must establish in his appeal that the greater weight and preponderance of the evidence admitted at trial contradicts the probate court's findings.[39]

In reviewing evidence addressing a testator's capacity, we focus on the condition of the testator's mind on the day the testator executed the will.[40] Under

---

[36] *Id.* 22.001(b).

[37] Tex. Gov't Code Ann. § 602.001.

[38] Tex. Est. Code Ann. § 251.104 (describing the form and content of the affidavits and jurats used in self-proved wills).

[39] *Cain*, 709 S.W.2d at 176.

[40] *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968) (emphasis added).

Texas law, whether a testator has the testamentary capacity hinges on the condition of the testator's mind the day the testator executed her will.[41] Thus, the proponents of the will must prove that, when the testator signed the will, she could understand

- the business in which she was engaged,
- the nature and extent of her property,
- the persons to whom she meant to devise and bequeath her property,
- the persons dependent on her bounty,
- the mode of distribution that she elected to choose among her beneficiaries,
- a sufficient memory so she could collect the elements of the business she wanted to transact and hold it in mind long enough to allow her to perceive the relationship between property and how she wanted to dispose of it,
- all so she could form reasonable judgments about doing those things.[42]

The evidence admitted in the trial provides substantial support for the probate court's conclusion that Paula had testamentary capacity in 2004, the day she signed her will. Wes, Merrie, and Nancy Karp provided the testimony that provides most of the support for the probate court's findings. Joe and his wife, Becky, disagreed with Wes and Merrie's view about Paula's capabilities that year. Joe suggests the evidence shows that Paula suffered from recurring depression many times in her life, including 2004. But there is no expert testimony showing Paula was clinically

---

[41] *Id.*

[42] *See Prather v. McClelland*, 13 S.W. 543, 546 (Tex. 1890); *see also In re Estate of Neuman,* No. 09-13-00570-CV, 2015 Tex. App. LEXIS 4909, at *6 (Tex. App.—Beaumont 2015, no pet.).

24

depressed. There are not medical records in evidence that support Joe's claim. While Joe argues Paula was not being treated for her condition in 2004, he never established that she was suffering from depression that year, as the parties never developed evidence about whether Paula was or was not seeing doctors at any time for any reasons at a time relevant to the day Paula signed the will. Furthermore, even Joe and Becky never testified that Paula told them at any time in 2004 that she was being treated for depression.[43]

Generally, the evidence admitted in the trial reflects that Paula chose to give her children a percentage share of her estate based on how much time they spent with her as she aged. Joe does not contend the evidence shows he spent more time with Paula than his siblings. Nor does he suggest that Paula miscalculated how much time he spent with her when compared with his siblings. Instead, Joe argues that Wes and Merrie obtained a larger share because they spent more time with her. That may be true, but that evidence does not show that Merrie and Wes used their influence to get Paula to change her will in a way that favored them during a period that Paula could not freely make that decision on her own.[44] The evidence Joe relies on to support his arguments is weak, and it certainly is not sufficient to demonstrate

---

[43] We do not suggest that evidence showing symptoms linked to depression, without more, is sufficient evidence that would allow a probate court to find a testator lacked testamentary capacity.

[44] *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *In re Estate of Coleman*, 360 S.W.3d 606, 610-11 (Tex. App.—El Paso 2011, no pet.).

that the greater weight and preponderance of the evidence conflicts with the verdict the probate court reached.[45] Joe's third issue is overruled.

*Suitability of Executors*

In Joe's last two issues, issues nine and ten, he argues that such a significant conflict exists between the personal interests of the Applicants and those of Paula's estate that they cannot properly discharge their duties in the office the probate court appointed them as co-executors. According to Joe, the evidence contradicts the probate court's finding that they are suitable for that office. Joe points to an alleged conflict of interest that he claims Merrie created with her duties as executor when she allowed her adult son to live in Paula's home without paying rent for several months after Paula died.

First, we note the standard of review that applies to orders appointing executors to administer a testator's estate. On appeal, these types of orders are reversible under and abuse of discretion standard.[46] In Paula's last will, she nominated the Applicants to serve as the joint co-executors of her estate. Joe suggests that Merrie and Wes are unsuitable for that office due to the conflicts in personalities he has with them. He also suggests they now face conflicting

---

[45] *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019) *see also In re Estate of Jones*, 197 S.W.3d 894, 900 (Tex. App.—Beaumont 2006, pet. denied).

[46] *Gossett v. Back*, No. 05-13-00283-CV, 2014 Tex. App. LEXIS 8531, at *8 (Tex. App.—Dallas 2014, no pet.); *Rogers v. Creel*, No. 09-06-012-CV, 2006 Tex. App. LEXIS 5415, at *6 (Tex. App.—Beaumont June 15, 2006, no pet.).

26

responsibilities since Merrie allowed her adult son to live in Paula's home after she died without paying rent.

When a testator nominates a person to be the executor of her will, the law requires the probate court to appoint that person to that office unless one of the enumerated exceptions in the Estates Code applies.[47] The exceptions allow the probate court to choose someone else other than the person the testator named if the person the testator named renounces the appointment, or the evidence shows the person is "not qualified,"[48] statutorily disqualified,[49] or "unsuitable" for the office.[50] Since the Estates Code requires probate courts to appoint the person the testator nominated in her will absent one of the listed exceptions, Joe was required to prove in the trial that Wes and Merrie were not qualified, statutorily disqualified, or unsuitable for the office.[51] Thus, since Joe is attacking an adverse finding on which he had the burden of proof in the trial, he "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."[52] To do that, he must show the evidence before the probate court conclusively shows one

---

[47] Tex. Est. Code Ann. § 304.001(a).
[48] *Id.* § 304.002.
[49] *Id.* § 304.003(1)-(3).
[50] *Id.* § 304.003(5).
[51] *Guyton v. Monteau*, 332 S.W.3d 687, 691-92 (Tex. App.—Houston [14th Dist.] 2001, no pet.).
[52] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).

of the enumerated exceptions to the provisions requiring probate courts to appoint the person the testator designated applies.[53]

Joe falls well short of meeting his appellate burden to conclusively establish the record in the trial shows that one of the enumerated exceptions applies. Turning first to Joe's argument about his personality conflicts with the Applicants, only Joe and Becky described Joe's relationship with his siblings as strained. As the factfinder, the probate court had the right to weigh the evidence and the credibility of any testimony.[54] Thus, Joe's testimony did not conclusively establish that discord of a sufficient nature exists such that Wes and Merrie are unable to discharge the duties of their office and place those duties above their own.[55]

Joe also points to the evidence that he asserts conclusively established that Wes and Merrie have a conflict because they must now decide whether to sue Merrie's son, Wes's nephew, for rent. The record shows that Merrie allowed her son to live in Paula's home for a three-month period that was before the probate court named her as the executor. She also testified that she paid the utilities on Paula's

---

[53] *See City of Keller*, 168 S.W.3d at 822.

[54] *Id*. at 819.

[55] Joe cites *Dean v. Getz*, 970 S.W.2d 629, 634 (Tex. App.—Tyler 1998, no pet.) for the proposition that family discord supports a finding of unsuitability, but the case is distinguishable. In *Dean*, unlike this case, the probate court found the individual the testator had designated as executor to be unsuitable. *Id*. The probate court did not do that here. In *Dean*, the Tyler Court of Appeals merely affirmed the probate court's judgment, explaining the probate court did not abuse its discretion. *Id*. at 635.

home using funds from her own account while her son lived there. Thus, the probate court could have viewed the fact that Merrie allowed the home to be occupied without also requiring rent as one that was beneficial to preserving the assets of Paula's estate.

Moreover, Joe is mistaken that the estate has a claim against Merrie or Merrie's son to collect rent. Paula's four children inherited the home as joint tenants under her will. Under Texas law, "so long as a joint tenant in possession does not bar the other from use of the commonly owned property, the tenant in possession has no obligation to pay rentals for that use."[56] There is no evidence in the record showing that the Applicants ever barred Joe from the home after Paula's death. We conclude Joe failed to meet his burden to conclusively establishes that any of the enumerated exceptions to the statute that required the probate court to name the persons the testator named in her will as the executors of her estate applied based on the circumstances shown here.[57] For these reasons, we conclude Joe's ninth and tenth issues lack merit so they are overruled.

---

[56] *In re Estate of Gober*, 350 S.W.3d 597, 601 (Tex. App.—Texarkana 2011, no pet.).

[57] *See* Tex. Est. Code Ann. § 304.003(5); *Gober*, 350 S.W.3d at 602 (reversing trial court's finding that the testator's daughter, whom the testator designated to serve as the executor of her estate, made the daughter an unsuitable executor for the estate based on evidence showing the daughter had a personality conflict with the testator's son and evidence showing the testator's daughter lived rent-free in testator's home after the testator died).

## Conclusion

We hold that Joe's issues lack merit. We affirm the trial court's order admitting Paula's will to probate and naming Wes and Merrie as the co-executors of Paula's estate.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on May 13, 2020
Opinion Delivered September 17, 2020

Before Kreger, Horton and Johnson, JJ.